Next case on the calendar is Mukaida v. Hawaii Good morning. May it please the court, my name is Emlyn Higa. I am the attorney for Plaintiff Edith Mukaida, who is the appellant in this case. This case is basically a sexual harassment case that was brought against the University of Hawaii and the State of Hawaii. Summary judgment motions were filed by defendants. The court granted summary judgment against the plaintiff, including the claim that is brought before the court on this appeal, that claim being hostile work environment. In the court's order, the court found that to establish hostile work environment by a co-worker, or to overcome summary judgment, there would have to be a genuine issue of material facts on the following elements, basically broken down into two parts. First, the basic elements, and then the response, if any, by the employer. On the three basic elements of conduct of a sexual nature, two, that that conduct was unwelcome. Three, that that conduct was severe, or the court below did find that there was a genuine issue of material fact as to those basic elements to present a triable issue. The court then moved on to the second part as to the response, if any, of the employer. No, I think you're skipping the middle step, which is that it was reported to the employer. Yes, I was getting to that, but as to the response, one, that the employer knew or should have known of the harassment, and two, if it did know or should have known, then did it... Well, let's talk about the did it know or should it have known. That's really where there is a serious dispute about whether there's a genuine issue of fact. As I understand the record, the individual that had breakfast, I guess, with your client, they had a long discussion, and he says that she never mentioned anything about any kind of sexual harassment. Your client, as I understand the record, and tell me if this is correct, came with a sort of a script, which is whatever it is, a script. But she testified that two things. One, at one point she said she didn't tell him that it was unwelcome sexual conduct. And then later she said she didn't remember what she did tell him, because she couldn't recall the conversation. So basically, your point is that you can create a genuine issue of fact by basing it on what she came to the meeting prepared to say. No, Your Honor, if I might take your points in order. First, the issue before the court is not as to whether the employer knew or should have known of the harassment, but rather the final element of whether, if they knew of the harassment, whether there was prompt and effective remedial action. Right, but if they didn't know of the harassment, then this case is over. That's right. Okay, so what's your best evidence that they knew or should have known of the harassment? First, in answer to Judge Reinhart's question and then to yours, the court below found that there was a genuine issue of material fact, that the report was made to Dr. Hamlet, that the U.H. and the state knew or should have known of the harassment. I believe that's on page 50 of the excerpts of record, which is the order of the lower court. Well, she didn't find that. She said she would assume it. Yes, she said that even though she was skeptical about the evidence, the testimony of Mrs. Mukaida, that for purposes of this motion, because it's a summary judgment motion, that she would assume that the report was made and granted summary judgment on that claim because the harassment had stopped. As to the evidence of the... Yes, but when we review this, we can affirm the summary judgment on any of the grounds. Yes, Your Honor. So that's why I wanted to explore that one with you. Okay. And it's particularly important because of this question and answer to your client in her deposition. Did you tell Dr. Hamlet in 1996 that you were having sex with Dr. Okamura and it was unwelcome on your part? No, because I was afraid it would get back that he would ask Dr. Okamura if it was true. Now, if she didn't tell Mr. Hamlet that there was unwelcome sex, what is it that she did tell him that would constitute a reason for the university to know that there was a sexual harassment or a hostile environment? Let me go to that portion of the transcript first, since you read that, and then go on to the other evidence that I believe is present in the record. I believe you were reading from page 50 on the excerpt of the record, which is also page 50 of the order, and her quotation of the question and answer of Mrs. Mukaida's deposition on October 11, 2000, at page 673. That page is in the state's supplemental excerpt of the record under tab D, where the context of that question and answer is given. On that page of the transcript, and basically my point is that that question and answer is clarified in its context, and the context is this, that she's being asked, did you report sexual harassment to anyone in the university in the period October 1997 to January 2, 1998? She said, no, because I explained that in December, mid-December 1996 to Dr. Hamlet. This is in the previous question and answer. She explicitly says, quote, because I explained that in December, mid-December 1996 to Dr. Hamlet. Upon my return in 1997 at work, I was told by Dr. Okamura that he and Mike Hamlet during the period I was gone had become good friends, and that anything I told Dr. Hamlet would come back to him. And so I no longer had Dr. Hamlet as an outlet. Then follows the question and answer that is excerpted in the order. Did you tell Dr. Hamlet in 1996 that you were having sex? And that's when she says, no, because she was afraid it would get back. In that context. But what's your best evidence that she did tell? The script. The script. Because she testifies that because she was so distraught, she brought the script with her to make sure that she went through all the points. Now, the state has in their. I mean, I guess I understand the script, but her affirmative testimony is that she didn't tell him. And then she goes on to say she was afraid it would get back. He would ask Dr. Okamura if it were true. So the odd thing to me is that you have basically the rest of your case is predicated on the failure of the university to discipline the doctor. But she didn't want that to happen. She didn't want him to talk to Dr. Okamura, right? I'm sorry. She didn't want Dr. Hamlet. She was afraid that he would ask Dr. Okamura if it was true. Right. Now, if she didn't want the university to contact Dr. Okamura at that point, how can we fault the university for not contacting him? It does come down, as you have said, to December 18, 1996, whether at that breakfast meeting she did tell Dr. Hamlet. Because as she's explaining here, she didn't prior to that December 18, 1996 meeting with Dr. Hamlet. Prior to that, as she's explained, she didn't want this to get back to Dr. Okamura or anyone because of the work situation that she was in with him. Doesn't this question and answer apply to what she told him at that meeting in December? The question and answer that — Page 50. Isn't that with reference to what she told him at the meeting in December? No, I would say it's 1996 prior to December 18, 1996. Your Honor, and the reason I say that is if you look at the context of the questioning, he's asking, why didn't you report it after December 1996? Or in 1997 and 1998, she explicitly says in the previous question and answer, because I explained that, the sex against my will, in December, mid-December 1996, to Dr. Hamlet. She affirmatively says in the answer before the excerpted portion, I told Dr. Hamlet about having sex against my will in mid-December 1996. That's why in the subsequent question, did you tell Dr. Hamlet in 1996 that you were having sex? She says, no, I would submit that she's referring to prior to December 18, 1996, because of the context. Is it not correct that she also said that she couldn't remember what she said during the conversation? Yes, there were portions of deposition where she said that she did not have a present recollection of what she said, and she referenced the script. That's why in answer to your question, I said the script is the best evidence, because she could only reference that she didn't have a present recollection that she could say. All she could say is, I went through the script, so if those points are in the script, I went through it at the meeting. She didn't give the script to Dr. Hamlet. I think her deposition testimony was that she doesn't remember whether she gave a copy of the script to Dr. Hamlet or not, it's just that she orally went through it with him point by point, which is why in my reply I quoted two areas in the script in which she explicitly reports sexual abuse by Dr. Okamura. And in the final page that's handwritten, she explicitly asks Mike, Dr. Hamlet, to help her. In her deposition, didn't she say that she was concerned about not getting Dr. Okamura into trouble when she was talking to him in December meeting? Yeah, she did say that in her deposition and explained in her deposition that she was afraid of Dr. Okamura and what he could do because of the position that he held in PSAT, the organization that they both worked in. Also that she was personally afraid of any retaliation. She brings that up again in the part of the script, the handwritten part of the script that I reproduced, or that I quoted in the reply brief, that she had promised Dr. Okamura never to tell about the abuse that she was suffering at his hands and that she was afraid of what would happen to her and to their daughter, that she was afraid that he would hurt them, hurt the daughter, hurt the program. At this point, as she also explained in her deposition, in December 18, 1996, she had decided to make the report to Dr. Hamlet, whereas previously she had decided not to, but she made the decision to make the report to Dr. Hamlet on December 18, 1996, because at that point she was now at the end of her rope. She had gone through a mental breakdown and she was about to go to Menninger Clinic in Topeka, Kansas. And basically there was nothing else that she could do. Right, but what did she expect the university to do at that point? I believe also in her deposition testimony she explained at the time she was not that knowledgeable of what the procedures would be or what to expect. All she knew was that she was at the end of her rope and she had to ask for help from someone. And so she went to her supervisor, Mike Hamlet. After that she knew she was going to be gone from the university because she was going to be in Topeka. Well, I mean, is it a fair inference that she didn't ask the university to take any action to investigate her discipline? I think it's a fair inference to make that she did not ask for any specific remedy, i.e., for example, investigation or talk to Dr. Okamura or something. All she says, and again the script is I believe the best evidence of what was said in that meeting, all she says at the end of that script is, Mike, please help me. So she asks for assistance, but she doesn't ask for any specific form of assistance like investigation or transfer or any of the other things that might have, I think that, I mean, we know are legally available to her. But the requirement for putting the university on notice is not, I would submit, is not that she asked for any specific remedy. Once she tells the university that there is sexual harassment going on, or in this case she specifically said sexual abuse is going on at the hands of Okamura, now the university is on notice and it is up to the university now to take prompt and effective remedial action. It is not for Mrs. Okamura to say this is what you need to do. Right, but if the report is ambiguous, that seems to me to involve a different set of obligations or trigger a different set of obligations. Yeah, I would submit that the report was not ambiguous as to putting the university on notice. If I might just have a moment. Understanding that she's, and I'm quoting from, I quoted the two portions of her script on page 16 of the reply brief, and that's what I'm referring to now. In the typewritten portion of her script that she used on December 18, 1996, she says that, of Dr. Okamura, another way he broke down my self-esteem was that my father was abusive and my first husband was physically and sexually abusive, and Norman, Dr. Okamura, would night after night for one year too many ask me to repeat the stories before we made love. I felt like I was being abused again. And in the handwritten portion, saying in what's numbered number one, Norman, Dr. Okamura is abusive. You haven't wanted the relationship since you couldn't trust him in 1994. Threats, he will hurt me, Mike. He will hurt Alexis, your daughter. Three, I gave him my word that I would love him 100% loyalty and never tell. Mike, please help me. I would submit, Your Honor, that as far as a report that sexual harassment is taking place, that that is not ambiguous. I think she's clearly putting the university on notice that something, that sexual harassment by this co-worker, by Dr. Okamura, is in fact taking place. Now, having received that allegation, as a manager, as a director of that department, having received that information, I would submit that it was, the university is now on notice to take prompt and effective remedial action, i.e. at least to investigate and find out if the allegations are true, and if so, to do something about it. Your Honor, on the point, I, I, sure, sure. I'm sorry. Go ahead. I have to apologize that the transcript excerpt that we began with is, creates a problem, and it creates a problem because of the fact that I was the attorney at the deposition. And I, I, I think on this point I wasn't vigilant enough because at that, at the point that he, the attorney asked a second time, did you tell Dr. Hammond in 1996? I should have objected that that's vague and ambiguous because she's already just said that she told him in December 1996. Do you mean prior to December 1996? It was my error not to object at that point, but that's the state of the, the transcript. And this is why I, I want to emphasize that the question and answer immediately preceding that excerpt is a critical context for the portion that was quoted by the court below. I see that my time is almost up. I would like to reserve whatever is remaining for rebuttal. We'll give you a couple minutes. Okay, thank you. If I may please the court. My name is Dean Choi and with me at council table is Evelyn Milwaukee on behalf of the Apalis, the state of Hawaii and the University of Hawaii. I understand the judge's focus on this December 1996 meeting. I submit that it's essentially a red herring. When you apply Justice Reinhart's opinion in the Holly D. Institute of Technology case and the analysis presented there, which was another sex harassment case within a university setting, that decision was filed on August 15th, 2003, about two and a half months ago. The situation that is presented to this court on this appeal deals with just very narrow piece of the many claims that were presented to the trial court. In particular, we have the claim that is here deals with what Justice Reinhart called a no tangible employment action claim. And for lack of a better term, hostile environment sex harassment. And then the question, as far as what's been presented by the briefing, is whether the employer has effectively presented the affirmative defense that is available in a hostile environment case. And that is whether they exercise reasonable care once they knew or should have known of the sex harassment activity. There were, with regard to the test for reasonable care, it's two pronged, as you all know. The first prong is, did the employer exercise reasonable care to prevent and correct promptly any sexual harassing activity? The second prong being, did the employee unreasonably fail to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise? The briefing presents now an even narrow issue on the first prong of this reasonable care test. And that is, did the employer exercise reasonable care to prevent or correct promptly any sexually harassing behavior? Then I believe it's narrowed even further at that point. And I focus on the words, did the employer exercise reasonable care to prevent and correct? And that the point that has been raised on appeal is that there's no challenge to any of the employer's actions and only to that one word, correct. That the position that is being taken by the plaintiff appellant is that sexual harassment must have occurred and no action was taken to correct it. The appellees maintain that they did an investigation. They found that there was no sexual harassment that had actually occurred. And that's the reason why there was no corrective action. So what the plaintiff wants you to do is to say that even though we made that determination, which necessarily means that we would not take corrective action, that the very fact that there's no corrective action taken means that the employer fails at that first prong of the reasonable care test. I think the record before you that gives this court an opportunity to make any determination of whether sexual harassment actually occurred is based upon the trial judge's order and the one question of fact that she found. And I think you need to appreciate the context in which this particular question of fact was made. And basically the trial court said that some, but not all, of Dr. Okamura's alleged perpetrators, alleged contacts with the plaintiff, Ms. Mukaida, were unwelcome. You can get some appreciation of the body of evidence that was presented at the trial level and that one single determination that the trial judge was able to make. She states that there was an immense amount of evidence introduced. Another point she mentions that there were voluminous papers submitted by the parties. Also as part of the supplemental record is the affidavit of declaration of the investigator who did the investigation on behalf of the University of Hawaii. She mentions that in the course of her investigation she interviewed 14 witnesses and there were over 2,800 pages of exhibits that were attached to her report. Now in that vast morass of information which basically stated that the conduct that is the subject of the sex harassment claim was consensual, all that the judge could find, and that was basically looking through the record herself as opposed to it being shown to her or directed to her by the plaintiff, was that some of Dr. Okamura's contacts were unwelcome. I submit that simply to the Hawley case where Justice Reinhart felt that the summary judgment was appropriate, appropriately granted in favor of the defendants because the plaintiff in that case failed to show any evidence of a connection between these feelings she had that her job was at stake versus I guess the incidences where her supervisor was asking for some kind of sexual accommodation, but that there was no connection. And I submit that all you have before this court presented by the trial judge is that there were some contacts that were unwelcome. I think appropriately the trial judge said that that was sufficient to save plaintiff's claims for assault and battery against Dr. Okamura, but there's absolutely no connection that's presented by that question of fact regarding anything, whether those contacts were of a sexual nature. I have a question. I have the impression that in the district court you took the position that reporting, if she did report sexual harassment at the breakfast, that that was not sufficient to comply with the university policy? No, no, Your Honor. On that point, of course we dispute, there's a dispute obviously as to what exactly, what amount of information was communicated at that meeting, but I posit that even if you assume that that information was conveyed, you will find also in the record that in the judge's order, in quoting from the deposition testimony of Ms. Bukata as well, is that she believed that the sex harassment started in the spring of 1994 and that this meeting is now December 1996, so almost two and a half years after the sex harassment starts. As Justice Reiner knows in the Holly D case, with regard to the second prong of the reasonable care test, did the employee unreasonably fail to take advantage of opportunities to, corrective opportunities, in that case it was found that the plaintiff failed that test because they waited one year after the harassment started, the alleged harassment started, and therefore that prong was satisfied for unreasonable failure to take advantage of these programs. Now, there's nothing that's been presented to this court by the plaintiffs regarding the sexual harassment policies that have been promulgated by the University of Hawaii in many respects similar to the California Institute of Technology policies that are discussed in the Holly D case. So here we have a two and a half, even if we give, even if we concede or assume that information suitable to convey complaint of sex harassment was conveyed at the December 1996 meeting, that's two and a half years later from the time that the plaintiff is complaining the sex harassment has started. And the affidavit that was presented shows that the University of Hawaii sex harassment policy and procedures were developed and promulgated from 1993 onwards. And it's undisputed that those, that system and that whole complaint procedure was available to the plaintiff. So I submit that even if you were to assume the information was conveyed that a sex harassment complaint was conveyed in December 1996, the two and a half year wait for her to... But you're not questioning that reporting it to Dr. Hartnett or whatever his name is, that that was... I certainly dispute that the information was conveyed. I think the record... No, that's not my question. You have a sexual harassment policy. Correct. There are procedures in the policy for what you do when you have a claim of sexual harassment. I'm asking you whether you are saying that she did not follow the procedures. Just make it clear, when she met with Mr. Hamnett, the... Well, the university concedes that the policy was definitively followed on July 1st, 1998. Yes, that's why I'm asking you. In 1998, when she filed a formal complaint, it all went according to the university policy, the procedures. They were invoked, immediately followed, there was an investigation. Everything took place in line with the policy. From looking at the district court opinion, I wasn't clear whether you were also saying that reporting this to Mr. Hamnett was not sufficient compliance with the procedures set forth in your policy. That's also my position, because I think that there is substantial ambiguity, or if there is clarity as to what was conveyed at that meeting, it comes from Dr. Hamnett. And we have conflicting testimony with regard to the script, with regard to recollection of what actually transpired or was communicated at that meeting by the plaintiff. I think the question is, assuming that she communicated unwelcome sexual harassment at that meeting, did the fact of the communication trigger the policy in your view, or not? That's a hypothetical. Okay. In my opinion, it would trigger the policy and the mechanisms and procedures that are laid out in the policy. I would also say that at that point in time... In other words, if he had believed that she had communicated... But part of this record is that there was no sex harassment that occurred after the December 1996 meeting. I understand that. I'm just trying to understand your position. So that the investigation that occurred in 1998 covered the same ground that an investigation would have covered if it had occurred in December 1996, assuming that a complaint of sex harassment was legitimately made at that time and an investigation should have taken place. I posit that investigation actually did take place. It took place two years later after the formal procedures were actually invoked, but that investigation would have covered the same ground. If the investigation occurred today, it would cover the same information and come up with the same conclusions. So the fact that it might have... If one were to assume that a sex harassment complaint was made in December 1996, it would not have changed the ultimate determination. That's not my question. I'm sorry. My question was, if she had complained, assuming that she complained, then was Dr. Hamden under an obligation to trigger an investigation at that point under the university policy? I believe he had a legal obligation to proceed with the matter, and I would assume that that would have been the likely step for him to have taken. And, in fact, when the university admits it first came to light, which was pursuant to a notation of worker's complaint, it was Dr. Hamden that directed Ms. Mukida to file the complaint under the formal sex harassment policy. I understand your position that it wouldn't have made any difference. I understand your position that there was no notice given. And I think I understand your position now that had notice been given, that he would have been obligated to set matters in motion at that point. I can see that. With regard, if there's any doubt, too, about this, well, there are a lot of doubts about this December 1996 meeting. I know it's a concern of the justices. In the discussion by or in the argument by plaintiff's counsel, he indicated that Ms. Mukida testified that she followed the script. Well, she also testified that she doesn't know she didn't know if she followed the script. What was presented under tab A in the supplemental are various portions of her depositions where she contradicts herself. And that was an ongoing problem with the presentation of a clean record in this case. I heard a quote from page 440 of her deposition transcript attached to tab A of the supplemental excerpts where the question is asked, what is your recollection as to the extent to which you followed this script at the actual meeting? The answer, I know I took it with me. I know that it was very important that I not cry because I wanted to get through the script. And that there were certain things that I wanted to make sure that he clearly knew. And the only really other thing, other than knowing that I probably only had coffee and that we were in a booth, is that I talked really fast trying to get a lot out. And then I started losing it. I don't remember anything after that. Question, when you say you started losing it, what happened? Answer, I was under a terrific amount of medications, much more than what I am taking right now. Between the emotional stimulation and the medication, I cried a lot in a very discreet way in a public place. And I was extremely embarrassed. Question, did it prevent you from completely going through the script with Dr. Hamnett at that time? Answer, I remember. I believe that he got this message. But I don't remember whether I went page by page or told him everything or gave him a copy or anything. I don't remember. That is, I think, a fairly accurate reflection of the nature of the examination as to the plaintiff's recollection about this meeting. Have you heard your opponent's characterization of the question and answer about 1996? It says that in context he was referring to the pre-December meeting. What's your view of that? I believe that he made a reference in the context to actually 1997, 1998, that a relationship developed with Dr. Okamura and Dr. Hamnett in 1997, 1998. And then he, from what I understood, he was trying to take that relationship and say that he was, so they were talking about a period in 1996 prior to the December 1996 meeting. So I believe the context does not justify the inference or the explanation that plaintiff's counsel was trying to present. With regard to whether corrective activity was taken, I again go back to the fact that there was a very thorough investigation. Voluminous documents and interviews were went through. Regardless of whenever that investigation, essentially that same investigation and its materials were presented to the trial judge, the only thing that was presented or that the trial judge could conclude was that maybe there were some incidences of unwelcome contact. There were no connections made to contact of a sexual nature. That is a question of fact that's before you, and that cannot support a genuine issue of whether there was sexual harassment that ever occurred. I think for the plaintiff to prevail with regard to his argument that the university was obligated to take corrective action, and in light of the cases he has cited, those cases all were, there were clear determinations in those cases of actual incidences of sexual harassment. And either they were faulty investigations or no investigations, and therefore they had wrongful determinations that no sexual harassment occurred, and therefore there was no corrective activity. But ultimately it was found that there was sex harassment. In this case, there wasn't sex harassment as the result of a very thorough investigation. The very best evidence that they can provide does not present the kind of connection that I believe this court would require to defeat summary judgment. It boils down to the issue, the same issue that was presented in the Holly Deak v. Caltech case. You have a tension now between unmerited, allowing unmerited cases to go to trial versus a wronged victim of sex harassment getting their day in court. I posit that with the record before you, you have, I think very substantially, a record that shows that the plaintiff was given every opportunity to present information at the trial level about to substantiate their claim, in particular what was unwelcome, and that the barest minimum was actually created as a question of fact. And even if you were to look at that question of fact as discussed by the trial judge, she makes a point of saying, I'm not saying that this would be, she infers that even that little bit would probably be unpersuasive at trial, but she's going to make the inferences in favor of the, or she's going to view the evidence in the light most favorable to the plaintiff. And that, with respect, though, to summary judgment on sex harassment claims, which is before you that that evidence is insufficient to defeat the summary judgment that was issued in favor of the defendants by the trial judge, and I ask the court to deny the appeal asserted by the plaintiff. Thank you. Because I agree with the court that the December 18, 1996 breakfast meeting is critical to our claim of hostile work environment, by a co-worker, whether in that December 18, 1996 meeting the university was put on notice, I would like to go through a couple of more points on that. And I apologize for if I'm becoming too repetitious on the excerpt, but since Mr. Choi was asked and gave some explanation, his explanation of the context, I would like to rebut that explanation. The transcript does not reveal, as Mr. Choi says, that the context was regarding the sexual abuse or sexual harassment that was going on. The context is explicitly about reporting. Where did you report? Who did you report to? When did you report? Did you report between October 1997 and January 1998? Not was there sexual harassment. The transcript explicitly says did you report during that time. It shows also in that immediately preceding question and answer that she explicitly says, in answer to the question, and I'm paraphrasing, the reason I didn't report in October 1997 or January 1998 is because I had already reported it in mid-December 1996 to Dr. Campbell. Mrs. Mukaita's, some of Mrs. Mukaita's testimony regarding what she said in that does become unclear at points. What Mr. Choi read in his argument is part of that. Also in that same transcript, however, again, I'm referring to the state supplemental excerpts of record under tab X, and I apologize the pages are not numbered, so I just have to refer to the transcript page, which is 150. Excuse me, 150. Question, do you recall if you used the term sex harassment or sexual harassment in this conversation with Dr. Hammond? Again, referring to the December 18, 1996 breakfast meeting answer. I'm fairly sure I used the word harassment, but I don't recall the conversation at all. I remember crying. I don't remember what he ate. I remember what booth we sat in. That's all I remember. I do know I imparted all the information in my script that I spent quite a bit of time preparing so that because of my emotional state, I would be able to impart all information necessary to him to make sure that he had the whole picture. Now, even in this, what I just quoted, she does make the statement, I don't recall the conversation at all, but that's in the midst of giving certain detail, like I used the word harassment. So I would say that those kinds of statements, like I don't remember the conversation at all, would have to be considered in the context of the answer. This is a layperson that's answering. And given that she was able to give some specific, like using the word harassment, like the fact that she prepared quite a bit in order to get through it because she knew it would be emotional and would be difficult, and she, as in the portion that I just read, tried to make sure that she would be prepared enough so that she could go through the entire script. So I would submit that even on that point of giving notice to the university, while there is conflicting evidence, Dr. Hamnett has denied that he was told that, there is a genuine issue of material fact. There is a jury question as to whether that notice was made. If there are no further questions, I don't know. Thank you very much, counsel. Case is arguably submitted. The final case of the week is Cahawaiola.
judges: Browning, Reinhardt, Thomas